E-FILED
Tuesday, 30 August, 2022  03:07:58 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

_____
)
UNITED STATES OF AMERICA,                )
)
)
Plaintiff,          )
)
v.                      )          Civil Action No. 1:22-cv-1289
)
RIVER CITY DIESEL, LLC, RCD             )
PERFORMANCE, LLC, MIDWEST TRUCK    )
AND 4WD CENTER, LLC, and JOSHUA   )
L. DAVIS,                                          )
)
)
Defendants.         )
_____)

**COMPLAINT**

The United States of America ("United States"), by authority of the Attorney General of the

United States and at the request of the Administrator of the United States Environmental

Protection Agency ("EPA"), files this Complaint and alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action brought under Sections 203, 204, and 205 of the Clean Air Act

   ("CAA" or "the Act"), 42 U.S.C. §§ 7522–7524, seeking injunctive relief and the

   assessment of civil penalties against River City Diesel, LLC, RCD Performance, LLC,

   Midwest Truck and 4WD Center, LLC, and Joshua L. Davis (collectively, "Defendants")

   for violations of the CAA related to the manufacture, sale, and installation of aftermarket

   products for motor vehicles or motor vehicle engines, and the tampering with motor

1

vehicles or motor vehicle engines. Additionally, pursuant to the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. §§ 3001-3308, the United States seeks to unwind or to recover certain transfers made to Mr. Davis by River City Diesel, LLC (hereinafter, "RCD").

## I. JURISDICTION

2. This Court has jurisdiction over the subject matter of and the parties to this action pursuant to 42 U.S.C. §§ 7523 and 7524, and 28 U.S.C. §§ 1331, 1345, and 1355.

3. Venue is proper in the Central District of Illinois pursuant to 28 U.S.C. §§ 1391(b)(2), 1391(c)(2) and 1395(a), as well as 42 U.S.C. § 7524(b), because it is the judicial district in which the Defendants are located, reside, are doing business, and/or in which a substantial part of the alleged violations in the Complaint occurred.

4. This action is properly filed in the Peoria Division because it is the Division in which the Defendants are located, reside, are doing business, and/or in which a substantial part of the alleged violations in the Complaint occurred.

5. Authority to bring this action is vested in the United States Department of Justice pursuant to Section 305 of the CAA, 42 U.S.C. § 7605, and 28 U.S.C. §§ 516 and 519.

## II. DEFENDANTS

6. Each Defendant is a "person" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

### Joshua L. Davis

7. Defendant Joshua L. Davis (hereinafter, "Mr. Davis") is an individual who has been working in the automotive performance parts industry since at least 2006.

8. Mr. Davis owned and was the registered agent and President of Defendants RCD, RCD

2

Performance, LLC (hereinafter, "RCDP"), and Midwest Truck and 4WD Center, LLC (hereinafter, "Midwest Truck").

9. Mr. Davis owned and was the registered agent and President of multiple companies that all operate or have operated at 1360 Spring Bay Road, East Peoria, IL, 61611, including:

   a.  RCD: established in February of 2008 and administratively terminated in November of 2018 during the course of EPA's investigation of RCD and Mr. Davis.

   b.  RCDP: established in November of 2018 during the course of EPA's investigation.

   c.  Midwest Truck: established in November of 2012 and administratively terminated in September 2019 during the course of EPA's investigation.

   d.  MWT4WD, LLC: established in December of 2018 during the course of EPA's investigation.

   e.  River City Machine, LLC (hereinafter, "RCM"): established in November of 2012.

   f.  RCD Auto Parts, LLC: established in November of 2012.

   g.  JL Davis Enterprises, LLC: established in November of 2012.

   h.  RC Distribution, LLC: established in November of 2018.

10. At all times relevant to this complaint, Mr. Davis had ultimate decision-making authority and directed the operations of RCD, RCDP, and Midwest Truck.

11. At all times relevant to this complaint, Mr. Davis was personally involved in the sale and installation of aftermarket products for motor vehicles or motor vehicle engines.

3

12. At all times relevant to this complaint, Mr. Davis had ultimate decision-making authority for RCD, RCDP and Midwest Truck.

13. At all times relevant to this complaint, Mr. Davis had the ability to prevent the CAA violations alleged in this Complaint but failed to do so.

14. At all times relevant to this complaint, Mr. Davis was a responsible corporate officer of RCD, RCDP and Midwest Truck for the CAA violations alleged in this Complaint.

### *River City Diesel, LLC*

15. RCD was registered as a limited liability company in Illinois on February 19, 2009.

16. RCD manufactured and sold aftermarket automotive hardware and software products for certified motor vehicles from at least January 1, 2015 to November 30, 2018.

17. RCD was administratively terminated on January 2, 2019 during EPA's investigation of RCD and Mr. Davis.

18. The principal office address for RCD was 1360 Spring Bay Road, East Peoria, IL 61611.

19. Mr. Davis was the owner, President, and LLC manager of RCD at all times relevant to this complaint.

### *RCD Performance, LLC*

20. RCDP was registered as a corporation in Florida on November 1, 2018 during EPA's investigation.

21. RCDP sells aftermarket automotive hardware and software products for certified motor vehicles.

22. The mailing address for RCDP is 711 W Moss Avenue, Peoria, IL 61606.

23. RCDP's website states that its distribution center is located at 1360 Spring Bay Road, East Peoria, IL 61611, the same address as RCD's principal office address.

24. Mr. Davis is the owner, President, and LLC manager of RCDP.

*Midwest Truck and 4WD Center, LLC*

25. Midwest Truck was registered as an LLC in Illinois on October 19, 2012.

26. Midwest Truck sold and installed aftermarket automotive hardware and software products for certified motor vehicles.

27. Midwest Truck was administratively terminated on September 3, 2019 during EPA's investigation.

28. The principal office address for Midwest Truck was 1360 Spring Bay Road, East Peoria, IL 61611.

29. Mr. Davis was the owner, President, and registered agent of Midwest Truck at all times relevant to this complaint.

30. J.L. Davis Enterprises, LLC was the LLC manager of Midwest Truck at all times relevant to this complaint. Mr. Davis is the LLC manager of J.L. Davis Enterprises, LLC.

## III. BACKGROUND

31. This action arises under Title II of the CAA, as amended, 42 U.S.C. §§ 7521–7590, and the regulations thereunder relating to the control of emissions of air pollution from motor vehicles and motor vehicle engines.

### A. Statutory and Regulatory Objectives

32. Title II of the CAA and the regulations promulgated thereunder establish stringent standards for the emissions of air pollutants from motor vehicles and motor vehicle engines that "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a). These pollutants include, but are not limited to particulate matter ("PM"), nitrogen oxides ("$NO_x$"), non-methane

5

hydrocarbons ("NMHCs"), and carbon monoxide ("CO"). 42 U.S.C. § 7521(a)(3)(A).

33. "Motor vehicle" is defined as "any self-propelled vehicle designed for transporting persons or property on a street or highway." 42 U.S.C. § 7550(2); 40 C.F.R. § 85.1703.

34. EPA has also established National Ambient Air Quality Standards for certain pollutants, including ozone, $NO_x$, PM, and CO. *See* 40 C.F.R. §§ 50.1–50.19.

35. PM is a form of air pollution composed of microscopic solid and liquid particles suspended in air. PM is emitted directly from motor vehicles and is also formed in the atmosphere from the emission of other pollutants, including from motor vehicles.

36. Ozone is a highly reactive gas that is formed in the atmosphere from emissions of other pollutants, including from motor vehicles.

37. $NO_x$ and NMHCs are reactive gasses that contribute to the formation of PM and Ozone.

38. Exposure to PM and Ozone is linked to respiratory and cardiovascular health effects as well as premature death. Children, older adults, people who are active outdoors (including outdoor workers), and people with heart or lung disease are particularly at risk for health effects related to PM or Ozone exposure.

39. CO is a highly toxic gas that can cause headaches, dizziness, vomiting, nausea, loss of consciousness, and death. Long-term exposure to CO has been associated with an increased risk of heart disease.

**B.    Acts Prohibited by the Clean Air Act, 42 U.S.C. §§ 7522(a)(3)(A) and (B)**

40. Section 203(a)(3)(A) of the CAA, 42 U.S.C. § 7522(a)(3)(A), makes it a prohibited act for "any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter prior to its sale and delivery to the ultimate purchaser, or for any person

6

knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser." Section 203(a)(3)(A) is also referred to as the "tampering" provision.

41. Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), makes it a prohibited act for "any person to manufacture or sell, or offer to sell, or install any part or component intended for use with, or as a part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."

42. Persons violating Sections 203(a)(3)(A) and (B) of the Act, 42 U.S.C. §§ 7522(a)(3)(A) and (B), are subject to injunctive relief pursuant to 42 U.S.C. § 7523.

43. Persons violating Sections 203(a)(3)(A) and (B) of the Act, 42 U.S.C. §§ 7522(a)(3)(A) and (B), are subject to civil penalties of up to $4,819 for each violation occurring after November 2, 2015, and assessed on or after January 13, 2020, in accordance with Sections 204(a) and 205(a) of the CAA, 42 U.S.C. §§ 7523(a) and 7524(a). 40 C.F.R. § 19.4 (2020).

44. Pursuant to 42 U.S.C. § 7524(a), each motor vehicle or motor vehicle engine tampered with in violation of Section 203(a)(3)(A) of the Act, 42 U.S.C. §7522(a)(3)(A), is a separate violation.

7

45. Pursuant to 42 U.S.C. § 7524(a), each part or component manufactured, sold, offered for sale, or installed in violation of Section 203(a)(3)(B) of the Act, 42 U.S.C. § 7522(a)(3)(B), is a separate violation.

**C.  EPA's Certificate of Conformity Program for New Motor Vehicles and Motor Vehicle Engines**

46. Manufacturers of new motor vehicles or motor vehicle engines must apply for and obtain a certificate of conformity ("COC") from EPA to sell, offer to sell, or introduce or deliver for introduction into commerce any new motor vehicle or motor vehicle engine in the United States. 42 U.S.C. § 7522(a)(1).

47. To obtain a COC, the original equipment manufacturer ("OEM") must demonstrate that the motor vehicle or motor vehicle engine will conform to established emissions standards for PM, $NO_x$, NMHC, CO, and other pollutants during a motor vehicle or motor vehicle engine's useful life. 42 U.S.C. § 7525(a)(2); *see* 40 C.F.R. §§ 86.007-30(a)(1)(i), 86.1848-01(a)(1).

48. The COC application must describe, among other things, the emission-related elements of design of the motor vehicle or motor vehicle engine. *See* 40 C.F.R. § 86.094-21(b)(1) ("The application . . . shall include the following: . . . a description of [the vehicle's] . . . emission control system and fuel system components."); *see also* 40 C.F.R. § 86.1844-01(d)–(e).

49. Once issued by EPA, a COC only covers those new motor vehicles or motor vehicle engines that conform in all material respects to the specifications provided to EPA in the COC application for such vehicles or engines. 40 C.F.R. § 86.1848-01(c)(6).

8

**D.     Emission-Related Elements of Design in Motor Vehicles and Motor Vehicle Engines**

50. An "element of design" is "any control system (i.e., computer software, electronic control system, emission control system, computer logic), and/or control system calibrations, and/or the results of systems interactions, and/or hardware items on a motor vehicle or motor vehicle engine." 40 C.F.R. § 86.1803-01.

51. OEMs install a variety of hardware and software elements of design in motor vehicles and motor vehicle engines that control emissions of pollutants in order to comply with the CAA and obtain certification, hereinafter referred to as "Emission-Related Elements of Design."

52. The Emission-Related Elements of Design described below are installed in motor vehicles or motor vehicle engines in compliance with Title II of the CAA and the regulations thereunder. *See, e.g.*, 42 U.S.C. § 7521 (setting emission and Onboard Diagnostics standards and directing EPA to establish standards by regulation); 40 C.F.R. § 86.007-11 (establishing emission standards for 2007 and later diesel heavy-duty engines and vehicles); 40 C.F.R. § 86.1844-01(d)–(e) (listing information requirements for COC applications, including calibration information); 40 C.F.R. § 86.004-25(a)(6) (defining "critical emissions-related components").

*Onboard Diagnostics*

53. Pursuant to 42 U.S.C. § 7521(m), the OEM is required to install an Onboard Diagnostics ("OBD") System on motor vehicles that must monitor, detect, and record malfunctions of all monitored Emission-Related Elements of Design. 40 C.F.R. §§ 86.007-17, 86.010-18, 86.1806-05.

54. The OBD System is an Emission-Related Element of Design.

9

55. The OBD System monitors and detects malfunctions of Emission-Related Elements of Design through a network of sensors ("OBD Sensors") installed throughout the motor vehicle and motor vehicle engine.

56. When the OBD System detects a malfunction of an Emission-Related Element of Design, it must illuminate the vehicle's Malfunction Indicator Light ("MIL") on the dashboard. *See* 40 C.F.R. § 86.1806-05(b)–(d).

57. When the malfunction indicator light is illuminated, the OBD must record a diagnostic trouble code. 40 C.F.R. § 86.1806-05(e).

*Emission Control Systems*

58. Exhaust Gas Recirculation ("EGR") Systems are Emission-Related Elements of Design that reduce $NO_x$ emissions by recirculating exhaust gas through the engine, thereby reducing engine temperature and $NO_x$ emissions.

59. "Aftertreatment" refers collectively to the Emission-Related Elements of Design "mounted downstream of the exhaust valve . . . whose design function is to reduce emissions in the engine exhaust before it is exhausted to the environment." *See* 40 C.F.R. § 1068.30. Diesel Particulate Filters ("DPFs"), Diesel Oxidation Catalysts ("DOCs"), Selective Catalytic Reduction ("SCR") Systems, and $NO_x$ Adsorption Catalysts ("NACs") are all part of Aftertreatment.

60. Aftertreatment Emission-Related Elements of Design are contained in OEM-installed stock exhaust pipes.

61. DPFs are Emission-Related Elements of Design that reduce the level of PM pollution contained in engine exhaust gas.

62. DOCs are Emission-Related Elements of Design that reduce CO and NMHC emissions

10

by promoting the conversion of those pollutants into less harmful gases.

63. SCR Systems are Emission-Related Elements of Design that reduce $NO_x$ emissions by chemically converting exhaust gas that contains $NO_x$ into nitrogen and water through the injection of diesel exhaust fluid.

64. NACs are Emission-Related Elements of Design that reduce $NO_x$ emissions by chemically adsorbing $NO_x$ from exhaust gas.

*Certified Stock Calibrations*

65. Motor vehicles are equipped with Electronic Control Units ("ECUs"), which are computers that monitor and control vehicle operations, including the operation of Emission-Related Elements of Design described above. OBD Systems and other Emission-Related Elements of Design operate in conjunction with ECUs.

66. OEMs set software parameters, also known as calibrations, that control, among other things, engine combustion and performance, operation of EGR and Aftertreatment systems, and OBD detection, warnings, and recording of malfunctions (hereinafter referred to as "Certified Stock Calibrations"). 40 C.F.R. §§ 86.1803-01.

67. OEMs program the ECUs with Certified Stock Calibrations and disclose them to EPA on their application for a COC for each vehicle model because they are part of a motor vehicle's overall emissions control strategy. Certified Stock Calibrations that must be included on the COC application include "fuel pump flow rate, . . . fuel pressure, . . . EGR exhaust gas flow rate, . . . and basic engine timing." 40 C.F.R. § 86.1844(e)(2); see also 40 C.F.R. pt. 85 app. VIII (listing vehicle and engine parameters and specifications); 40 C.F.R. pt. 86 app. VI (listing vehicle and engine components).

68. Certified Stock Calibrations are Emission-Related Elements of Design.

11

### E.    The Types of Aftermarket Products at Issue

69. Defendants have manufactured, sold, offered for sale, and/or installed products that are designed to alter, replace, or disable OEM-installed elements of design, including Emission-Related Elements of Design, in order to enhance a vehicle's power and/or performance, improve a vehicle's fuel economy, or reduce the costs related to operating and maintaining a vehicle's Emission-Related Elements of Design (hereinafter "Aftermarket Performance Products").

70. Aftermarket Performance Products' effect on vehicle power and/or performance, vehicle fuel economy, or Emission-Related Elements of Design maintenance costs is derived from their effect of bypassing, defeating, or rendering inoperative devices or Emission-Related Elements of Design.

### *Hardware Products*

71. Some Aftermarket Performance Products are hardware products that physically interfere with or replace Emission-Related Elements of Design (hereinafter, "Hardware Products").

72. Some Hardware Products interfere with exhaust recirculation in the EGR System (e.g., "blocker plates," "block off plates," "block-off caps", "delete plates", or "EGR stealth plates"). These Hardware Products are hereinafter referred to as "EGR Delete Hardware Products."

73. Some Hardware Products replace all or part of the Aftertreatment system, allowing the physical removal of the DOCs, DPFs, NACs, OBD Sensors, and/or SCR System (e.g., "straight pipes," "race pipes," or "test pipes"). These Hardware Products are hereinafter referred to as "Aftertreatment Delete Hardware Products."

12

*Software Products*

74. Some Aftermarket Performance Products are electronic software products (hereinafter, "Tunes") that alter or overwrite aspects of a motor vehicle's ECU and/or OBD System.

75. Tunes can be stored and transmitted in numerous ways, including electronically though email and through electronic storage devices (hereinafter, "Tuners").

76. Some Tunes manipulate the ECU and/or OBD System to electronically disable or allow for the full physical removal of Emission-Related Elements of Design. These Tunes are hereinafter referred to as "Delete Tunes."

77. Some Delete Tunes manipulate the monitoring function of the OBD System so that it will fail to detect the new Hardware Products and the removal of a vehicle's Emission-Related Elements of Design. As a result, the OBD System may not trigger a malfunction indicator light or record a diagnostic trouble code.

F.    **Federal Debt Collection Procedures Act, 28 U.S.C. § 3304**

78. The FDCPA provides that certain transfers of assets made by those who owe a debt to the United States are fraudulent and provides remedies in the event such fraudulent transfers are made.

79. Section 3304(a) of the FDCPA provides:

(a) Debt Arising Before Transfer.—Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States which arises before the transfer is made or the obligation is incurred if—

(1) (A) the debtor makes the transfer or incurs the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and

(B) the debtor is insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation; or

(2) (A) the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time; and

13

(B) the insider had reasonable cause to believe that the debtor was insolvent. 28 U.S.C. § 3304(a).

80. Section 3304(b) of the FDCPA applies where a debtor had actual intent to defraud the United States and sets forth criteria for determining whether transfers are fraudulent, regardless of whether the transfer occurred before or after a debt to the United States accrued:

(b) Transfers without regard to date of judgment.— (1) Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation— (A) with actual intent to hinder, delay, or defraud a creditor; or (B) without receiving a reasonably equivalent value in exchange for the transfer or obligation if the debtor— (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. 28 U.S.C. § 3304(b).

81. Section 3304(b) of the FDCPA lists factors—known as the badges of fraud—that may be considered in determining actual intent to defraud. 28 U.S.C. § 3304(b)(2).

82. The badges of fraud include, but are not limited to: whether the transfer was to an Insider, whether the debtor retained possession of the asset after the transfer, whether the transfer occurred after the debtor had been sued or threatened with suit, whether the transfer consisted of all or substantially all of the debtor's assets, whether the value of consideration received for the transferred asset was reasonably equivalent to the value of the transferred asset, whether the debtor was insolvent or became insolvent shortly after the transfer was made, and whether the transfer occurred shortly before or shortly after a substantial debt was incurred. 28 U.S.C. § 3304(b)(2).

83. The FDCPA provides the United States with several remedies for a fraudulent transfer:

14

"(1) avoidance of the transfer . . . to the extent necessary to satisfy the debt to the United States; (2) a remedy [under the FDCPA] against the asset transferred or other property of the transferee; or (3) any other relief the circumstances may require."  28 U.S.C. § 3306(a).

84. The FDCPA defines "insider" to include, *inter alia*, an officer, director, or person in control of the debtor.  28 U.S.C. § 3301(5)(B).

85. The FDCPA provides that judgment may be entered against "the first transferee of the asset or the person for whose benefit the transfer was made" or "any subsequent transferee, other than a good faith transferee who took for value or any subsequent transferee of such good-faith transferee."  28 U.S.C. § 3307(b).

## IV.    FACTUAL ALLEGATIONS

### *EPA's First Inspection*

86. In October 2017, EPA filed an administrative complaint against Spartan Diesel Technologies, LLC, ("Spartan") alleging that Spartan manufactured, sold, offered to sell, or installed defeat devices.

87. As part of its investigation of Spartan, EPA determined that RCD sold numerous Spartan tuners.  This determination prompted EPA to investigate RCD.

88. On January 11, 2018, EPA inspectors conducted a CAA inspection of RCD's East Peoria, IL facility (the "Facility") located at 1360 Spring Bay Road.

89. Mr. Davis was present at the inspection and identified himself as the owner of RCD.

90. Mr. Davis told EPA inspectors that RCD began manufacturing parts in 2009 and that RCD makes replacement parts for engines.

91. Mr. Davis told EPA inspectors that he was aware of EPA's efforts to prevent the tampering of motor vehicle parts and had recently spoken with an EPA representative at a

15

trade show.

92. During the inspection, Mr. Davis told EPA inspectors that the RCD website was outdated and unsupported suggesting that there were no ongoing sales of any products, including illegal products that delete vehicle emission controls.

93. Despite Mr. Davis' claim that the website was outdated, EPA later determined that the RCD website was operational and processed customer's orders, including orders for illegal products that delete vehicle emission controls, up until at least March 13, 2018, demonstrating that Mr. Davis's assertion to the contrary during the inspection was false.

94. During the inspection, Mr. Davis admitted that RCD sold defeat devices in the past.

95. During the inspection, Mr. Davis claimed that RCD no longer sells defeat devices.

96. EPA later determined that RCD manufactured and sold defeat devices up until at least November 30, 2018, demonstrating that again, Mr. Davis's assertion to the contrary during the inspection was false.

97. Mr. Davis initially denied EPA inspectors access to the facility on January 11,2018.

98. After he made a phone call, Mr. Davis allowed EPA access and escorted EPA inspectors to RCD's warehouse.

99. EPA inspectors observed numerous tuners (including performance-enhancing tuners that are known to be compatible with Delete Tunes), EGR Delete Hardware Products, and Aftertreatment Delete Hardware Products in RCD's warehouse.

   a. EPA inspectors found instruction manuals with the following titles: "2011-2014 Ford 6.7L Power Stroke EGR Delete" and "Duramax LMM EGR Delete."

   b. EPA inspectors photographed an invoice dated January 9, 2018 for a "Race Me Race Tuner 2010-2011 6.7 Cummins" and a "2007.5-2012 Dodge Ram HD

16

2500/3500 4" Turbo Black 409 Stainless CAT/DPF Delete Pipe."

c. EPA inspectors observed stacks of straight pipes labeled as "RCD-6.4 DPF DEL Lower 409," and boxes labeled as "Flo~Pro Performance Exhaust 01-10 GM CAT Race Pipe," and "ATLAS Exhaust Race Pipe 4" Aluminized Steel Race Pipe."

100. After 37 minutes, Mr. Davis requested that the EPA inspectors leave the Facility.

*EPA's First and Second Information Requests*

101. On February 15, 2018, EPA sent RCD a request for information under Section 208 of the CAA, 42 U.S.C. § 7542, requesting information related to RCD's purchase, production, sale, distribution, installation, and advertisement of diesel engine motor vehicle and diesel engine parts or components between January 1, 2015 and February 15, 2018.

102. On May 30, 2018, EPA received RCD's initial response signed and certified by Mr. Davis as the President of RCD.

103. The response stated that due to a Quickbooks data loss incident, RCD was unable to provide sales data for the period from January 1, 2015 to approximately January of 2017.

104. RCD provided a Sales Spreadsheet that included details and sales information for select diesel engine parts and components that RCD manufactured, purchased, and/or sold from January of 2017 to the first quarter of 2018.

105. Several products that EPA inspectors observed during the January 11, 2018 inspection were absent from RCD's response.

106. RCD objected to several of the requests of the February 15, 2018 information request and did not provide complete responses.

107. On October 29, 2018, EPA issued to RCD a second request for information under Section

17

208 of the CAA, 42 U.S.C. § 7542, requesting: further information related to RCD's sales and Quickbooks files, complete responses, and supplemental information about RCD's products.

108. On November 28, 2018, EPA received RCD's supplemental response signed and certified by Mr. Davis as the President of RCD.

109. RCD provided a partial response to EPA's inquiries regarding the data loss incident and provided information about additional RCD products.

110. RCD continued to object to several of the requests of the October 29, 2018 information request and did not provide complete responses.

111. On December 10, 2018, EPA emailed RCD to clarify RCD's partial explanation of the data loss incident and inquired as to RCD's intent to respond in full to EPA's October 29, 2018 information request.

112. On December 12, 2018, RCD's counsel notified EPA that RCD would respond in full to EPA's October 29, 2018 information request.

113. On January 4, 2019, EPA received RCD's supplemental response to EPA's requests for information signed and certified by Mr. Davis as the President of RCD.

114. RCD stated that it had been able to recover data it initially believed to be lost.

115. RCD provided amended Sales Spreadsheets and Quickbooks files.

116. Within the Quickbooks data provided by RCD, there are numerous entries reflecting RCD's manufacture and sale of defeat devices.

117. Within the Quickbooks data provided by RCD, there are numerous instances of Joshua L. Davis's initials, "JLD," identified as the sales representative involved in the sale of defeat devices.

18

118. Within the Quickbooks data, there is evidence that RCM manufactured parts that were integral to many of RCD's EGR Delete Hardware Products and Aftertreatment Delete Hardware Products.

119. RCM sold the parts referenced above to RCD and through RCD to customers.

120. Within the Quickbooks data, there is evidence of sales of numerous defeat devices from RCD to Midwest Trucks.

### *Termination of RCD and Continued Business as RCDP*

121. As part of its January 4, 2019 response to EPA's information requests, RCD provided EPA with a copy of a Statement of Termination that Mr. Davis filed with the Illinois Secretary of State on November 30, 2018.

122. EPA confirmed that the corporate status of RCD was "Terminated," as of January 2, 2019.

123. On January 29, 2019, EPA became aware of an eBay seller named "rcd_performance."

124. The images advertising many of the products listed on the rcd_performance eBay store page were watermarked with the same RCD logo that was used on the previous RCD website to promote RCD-brand products.

125. The eBay seller's website had the following notice: "We are currently suspending all sales on eBay. Please contact us for more info. Google RCD Performance."

126. EPA accessed a website operated by a "RCD Performance," (www.rcdperformance.com), which stated that RCDP was located at 1360 Spring Bay Road, East Peoria, IL and was operated by Mr. Davis, "President of RCD Performance."

127. EPA confirmed through the Florida Department of State, Division of Corporations database, that RCDP's current business registration, which was filed on November 2,

2018, lists Mr. Davis as the Registered Agent.

128. RCDP was registered during the course of EPA's investigation of RCD and Mr. Davis.

### EPA's Finding of Violation

129. Based on its review of RCD's responses to EPA's information requests, on March 12, 2019, EPA issued a Finding of Violation ("FOV") to RCD alleging that RCD sold at least thousands of tuners that consist of software and/or devices that render inoperative the original programming of a diesel engine vehicle's ECM.

130. The FOV also alleged that RCD manufactured and/or sold at least thousands of other parts or components that disable, remove, bypass, defeat, or render inoperative the EGR, DOC, DPF, and/or SCR systems on diesel engine vehicles.

131. The FOV alleged that information EPA collected indicates that Mr. Davis personally participated in the manufacture, sale, and/or offering to sell the products identified above.

132. The FOV was twice refused delivery on March 18, 2019 and March 19, 2019.

133. EPA emailed an electronic copy of the FOV to Mr. Davis on April 11, 2019 and again to Mr. Davis and the RCDP sales email address on May 3, 2019. EPA did not receive a response to either email.

### EPA's Third Information Request and Second Inspection

134. On October 31, 2019, EPA issued a third request for information under Section 208 of the CAA, 42 U.S.C. § 7542, to Mr. Davis and several LLCs for which he was the registered agent: (1) J.L. Davis Enterprises, LLC; (2) Midwest Truck; (3) MWT4WD, LLC; (4) RCD Auto Parts, LLC; (5) RC Distribution, LLC; (6) RCDP; and (7) River City Machine, LLC.

135. The third information request sought: (1) information on the businesses that operate or

have operated since January 1, 2017 at 1360 Spring Bay Road in East Peoria, Illinois, and the relationship between the businesses; (2) information on the manufacture, sale, and installation of defeat devices by the businesses identified in the information request; and (3) information on the removal or rendering inoperative devices or elements of design installed on or in motor vehicles or motor vehicle engines by the businesses identified in the information request.

136. The third information request was refused delivery on November 5, 2019.

137. On December 13, 2019, EPA inspectors attempted to conduct a second CAA inspection of the Facility.

138. Upon requesting entry to the Facility, they were told by an accountant named William E. Mims, CPA (hereinafter, "Mr. Mims") that Mr. Davis was not present and that no one at the Facility was authorized to speak with EPA.

139. EPA inspectors were able to speak with Mr. Davis on the phone.

140. Mr. Davis confirmed that he would not grant EPA access to the Facility.

141. Mr. Davis stated that EPA could leave the March 12, 2019 FOV and the third information request dated October 31, 2019 with an employee at the Facility.

142. EPA photographed the parking lots and the exterior of the Facility.

    a. The Facility consisted of two buildings.

    b. The larger building had at least eight garage doors. The smaller building had at least three garage doors.

    c. EPA observed approximately 45 vehicles parked in the parking lots; the majority of the vehicles observed were pick-up trucks.

143. On January 10, 2020, Mr. Davis sent an email to EPA stating that he would respond to

the information request and that he was collecting responsive documents for the third information request.

144. On January 27, 2020, EPA received an un-certified and un-signed response to the third information request from Mr. Mims, Mr. Davis' CPA.

145. In reply to the question: "Since January 1, 2017, have you removed or rendered inactive, any device or element of design installed on or in a motor vehicle or motor vehicle engine," the response stated "Yes" for Midwest Truck.

146. The response also included a list of defeat devices that Midwest Truck had installed and invoices for work that Midwest Truck had completed.

147. The response further stated that Mr. Davis is President of all the entities listed in the third information request.

148. On March 13, 2020, EPA sent a follow-up letter to Mr. Davis stating that EPA had completed its review of the response to its third information request and that EPA had determined that the response was not complete due to several deficiencies. The follow-up letter requested supplemental information that was missing from the response.

149. Mr. Davis provided a response to the follow-up letter on April 3, 2020.

150. On April 9, 2020, EPA sent an email to Mr. Davis requesting an authorized signature and certification that the response to the third information request was complete.

151. On April 17, 2020, Mr. Davis responded by email that he considered his response to be both adequate and complete. He did not provide certification or an authorized signature.

*Publicly Available Information*

152. EPA accessed the "About" page on RCD's Facebook page on January 31, 2018. The page included the following description: "We offer basic bolt ons all the way to full

22

performance engine builds.  We do full custom tuning on the Ford Powerstrokes, carry many options of Cummins tuning products, and also carry many GM tuning products."

153. EPA accessed RCD's website on June 28, 2018.  The website stated: "River City Diesel, LLC, consists of individuals who know aftermarket performance. . . . We install and test what we sell. . . . Whether you're looking for an additional 2-4 miles per gallon or moderate to extreme added horsepower and torque for towing or sport/race application, we can get you the best system available for your needs and in your price range.  We have done and continue to do extensive dyno testing on all key performance parts as well as real-world fuel economy testing and comparison. . . . Whether to go with a programmer/downloader or in-line tuner/module, we can explain the benefits and advantages of both as well as give our professional opinions in regard to manufacturers based on OUR first-hand experience/testing."

154. EPA obtained copies of manuals from RCD's website and in response to its information requests that contained detailed installation instructions for several EGR Delete Hardware Products and Aftertreatment Delete Hardware Products advertised by RCD.

155. Third-party companies advertised EGR Delete Hardware Products manufactured and/or offered for sale by RCD.  The eBay page of Rudy's Performance Parts, accessed on March 13, 2019, advertised a River City Diesel product with the following description: "If a top rated EGR delete kit is what you're searching for, welcome home.  This complete 6.6L Duramax LLY EGR cooler/valve delete kit by River City Diesel is a top product. . . . this EGR delete kit completely replaces the EGR system—no other parts are needed."

156. On February 21, 2020, RCDP's website had the following description: "RCD Performance, LLC, consists of individuals who know aftermarket performance. . . . We install and test what we sell. . . . When we tell you that the product will perform, it will. We have installed and dynotested all of our parts. Tell us your horsepower goals and we can put together a package for your needs. If you don't see it on the site, just give us a call."

157. Upon reviewing RCDP's website, EPA observed several suspected defeat devices, including turbocharger kits and intake manifold elbows, offered for sale.

158. The product description of the 6.4L Ford Power Stroke 304 Stainless Steel Intake Manifold Elbow on RCDP's website states: "Requires EGR Delete."

159. In April 2020, EPA purchased the 6.4L Ford Power Stroke 304 Stainless Steel Intake Manifold Elbow from RCDP through a contractor.

160. EPA was able to confirm that the intake manifold elbow was an EGR Delete Hardware Product.

161. Upon reviewing RCDP's eBay page, EPA observed a similar intake manifold elbow for sale. The description for this intake manifold elbow states: "You MUST run an EGR Delete kit with this elbow, it is not optional, it is mandatory!"

162. The purchase history for this product on RCDP's eBay page indicates that the three most recent sales of this product occurred on January 16, 2019, September 7, 2019, and September 27, 2019.

*Mr. Davis's Role*

163. EPA observed a post to the Facebook page "Josh Davis for Woodford County Board," dated February 28, 2018, with the following written statement: "My name is Josh Davis . . . . in 2006, I decided to start manufacturing performance parts for diesel engines. . . In the spring of 2009, I officially incorporated my business, started marketing, and hired two employees to help with the operation. . . Currently, we generate close to ten million dollars annually in revenue."

164. As noted above, Mr. Davis represented to EPA that he was the only person who could grant access to the Facility for EPA's inspections.

165. Mr. Davis represented to EPA that he was aware of EPA's efforts to prevent the manufacture, sale, and installation of defeat devices.

166. Mr. Davis was the listed sales representative in RCD's Quickbooks data for the sale of defeat devices.

167. Mr. Davis was listed as the representative on at least one Midwest Truck invoice for the installation of aftermarket defeat devices on a motor vehicle.

168. On at least September 9, 2018, Mr. Davis offered to sell on his personal Facebook page three H&S Mini Maxx tuners; one of the photographs associated with this post shows the product description, which states that the Mini Maxx tuner "[a]llows DPF/EGR removal."

25

## V. **FIRST CLAIM FOR RELIEF**

### *Against RCD and Mr. Davis for the Manufacture of Aftermarket Performance Products in violation of Section 203(a)(3)(B) of the CAA*

169. The United States re-alleges Paragraphs 1– 168 above as fully set forth herein.

170. Between January 1, 2015 and November 30, 2018, RCD manufactured numerous Aftermarket Performance Products.

171. The Aftermarket Performance Products are intended for use with certified motor vehicles and motor vehicle engines.

172. The Aftermarket Performance Products bypass, defeat, or render inoperative a vehicle's EGR System, OBD System, DPFs, DOCs, SCR System, and/or NACs.

173. The EGR System, OBD System, DPFs, DOCs, SCR System, and/or NACs are Emission-Related Elements of Design installed on or in motor vehicles or motor vehicle engines in compliance with Title II of the CAA.

174. A principal effect of each Aftermarket Performance Product is to bypass, defeat, or render inoperative a vehicle's Emission-Related Elements of Design.

175. Each unit of the Aftermarket Performance Products RCD manufactured and intended for use with, or as a part of, any motor vehicle or motor vehicle engine where a principal effect of the unit is to bypass, defeat, or render inoperative any element of design is a separate violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).  42 U.S.C. § 7524(a).

176. RCD and Mr. Davis knew or should have known that the Aftermarket Performance Products were being manufactured for such use.

177. RCD and Mr. Davis are liable to the United States for injunctive relief and civil penalties of up to $3,750 for each violation of Section 203(a)(3)(B) occurring on or after

26

January 13, 2009, through November 2, 2015, and injunctive relief and civil penalties of up to $4,819 for each violation of Section 203(a)(3)(B) occurring after November 2, 2015, and assessed on or after January 13, 2020, in accordance with Sections 204(a) and 205(a) of the CAA, 42 U.S.C. §§ 7523(a) and 7524(a). 40 C.F.R. § 19.4 (2020).

## VI. SECOND CLAIM FOR RELIEF

*Against RCD, RCDP, Midwest Truck, and Mr. Davis for the Offer for Sale and Sale of Aftermarket Performance Products in Violation of Section 203(a)(3)(B) of the CAA*

178. The United States re-alleges Paragraphs 1–168 above as fully set forth herein.

179. Between at least January 1, 2015 and November 30, 2018, RCD and Mr. Davis sold numerous Aftermarket Performance Products.

180. Between at least May 3, 2017 and November 6, 2018, Midwest Truck and Mr. Davis sold numerous Aftermarket Performance Products, many of which it purchased from RCD.

181. Between at least January 1, 2019 and September 27, 2019, RCDP and Mr. Davis sold numerous Aftermarket Performance Products.

182. The Aftermarket Performance Products are intended for use with certified motor vehicles and motor vehicle engines.

183. The Aftermarket Performance Products bypass, defeat, or render inoperative a vehicle's EGR System, OBD System, OBD Sensors, Certified Stock Calibrations, DPFs, DOCs, SCR System, and/or NACs.

184. The EGR System, OBD System, OBD Sensors, Certified Stock Calibrations, DPFs, DOCs, SCR System, and/or NACs are Emission-Related Elements of Design installed on or in motor vehicles or motor vehicle engines in compliance with Title II of the CAA.

185. A principal effect of each Aftermarket Performance Product is to bypass, defeat, or render inoperative a vehicle's Emission-Related Elements of Design.

186. Each unit of the Aftermarket Performance Products RCD, Mr. Davis, Midwest Truck, and RCDP sold or offered for sale, and intended for use with, or as a part of, any motor vehicle or motor vehicle engine where a principal effect of the unit is to bypass, defeat, or render inoperative any element of design is a separate violation of Sections 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).  42 U.S.C. § 7524(a).

187. RCD knew or should have known that the Aftermarket Performance Products were being offered for sale or sold for such use or put to such use.

188. Mr. Davis knew or should have known that the Aftermarket Performance Products were being offered for sale or sold for such use or put to such use.

189. Midwest Truck knew or should have known that the Aftermarket Performance Products were being offered for sale or sold for such use or put to such use.

190. RCDP knew or should have known that the Aftermarket Performance Products were being offered for sale or sold for such use or put to such use.

191. RCD, Mr. Davis, Midwest Truck, and RCDP are each liable to the United States for injunctive relief and civil penalties of up to $3,750 for each violation of Section 203(a)(3)(B) occurring on or after January 13, 2009, through November 2, 2015, and injunctive relief and civil penalties of up to $4,819 for each violation of Section 203(a)(3)(B) occurring after November 2, 2015, and assessed on or after January 13, 2020, in accordance with Sections 204(a) and 205(a) of the CAA, 42 U.S.C. §§ 7523(a) and 7524(a).  40 C.F.R. § 19.4 (2020).

## VII. <u>THIRD CLAIM FOR RELIEF</u>

*Against Midwest Truck and Mr. Davis for the Installation of Aftermarket Performance Products in Violation of Section 203(a)(3)(B) of the CAA*

192. The United States re-alleges Paragraphs 1–168 above as fully set forth herein.

28

193. Between at least May 3, 2017 and November 6, 2018, Midwest Truck and Mr. Davis installed Aftermarket Performance Products.

194. The Aftermarket Performance Products are intended for use with certified motor vehicles and motor vehicle engines.

195. The Aftermarket Performance Products bypass, defeat, or render inoperative a vehicle's EGR System, OBD System, OBD Sensors, Certified Stock Calibrations, DPFs, DOCs, SCR System, and/or NACs.

196. The EGR System, OBD System, OBD Sensors, Certified Stock Calibrations, DPFs, DOCs, SCR System, and/or NACs are Emission-Related Elements of Design installed on or in motor vehicles or motor vehicle engines in compliance with Title II of the CAA.

197. A principal effect of each Aftermarket Performance Product is to bypass, defeat, or render inoperative a vehicle's Emission-Related Elements of Design.

198. Each unit of the Aftermarket Performance Products Midwest Truck and Mr. Davis installed and intended for use with, or as a part of, any motor vehicle or motor vehicle engine where a principal effect of the unit is to bypass, defeat, or render inoperative any element of design is a separate violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).  42 U.S.C. § 7524(a).

199. Midwest Truck knew or should have known that the Aftermarket Performance Products were being installed for such use or put to such use.

200. Mr. Davis knew or should have known that the Aftermarket Performance Products were being installed for such use or put to such use.

201. Midwest Truck and Mr. Davis are each liable to the United States for injunctive relief and civil penalties of up to $4,819 for each violation of Section 203(a)(3)(B) occurring after

29

November 2, 2015, and assessed on or after January 13, 2020, in accordance with Sections 204(a) and 205(a) of the CAA, 42 U.S.C. §§ 7523(a) and 7524(a). 40 C.F.R. § 19.4 (2020).

## VIII. <u>FOURTH CLAIM FOR RELIEF</u>

### *Against Midwest Truck and Mr. Davis for Tampering with Motor Vehicles in Violation of Section 203(a)(3)(A) of the CAA*

202. The United States re-alleges Paragraphs 1–168 above as fully set forth herein.

203. Between at least May 3, 2017 and November 6, 2018, Midwest Truck and Mr. Davis installed Aftermarket Performance Products on or in motor vehicles and/or motor vehicle engines after the sale and delivery of the vehicle and/or engine to the ultimate purchaser.

204. The installation of Aftermarket Performance Products removes or renders inoperative devices or elements of design installed on or in motor vehicles or motor vehicle engines in compliance with the regulations promulgated under Title II of the CAA, including the EGR System, OBD System, OBD Sensors, Certified Stock Calibrations, DPFs, DOCs, SCR System, and/or NACs.

205. Midwest Truck knew or should have known that the installation of the Aftermarket Performance Products removed or rendered inoperative devices or elements of design installed on or in motor vehicles or motor vehicle engines in compliance with the regulations promulgated under Title II of the CAA.

206. Mr. Davis knew or should have known that the installation of the Aftermarket Performance Products removed or rendered inoperative devices or elements of design installed on or in motor vehicles or motor vehicle engines in compliance with the regulations promulgated under Title II of the CAA.

207. Each motor vehicle or motor vehicle engine for which any device or element of design

was removed or rendered inoperative is a separate violation of Section 203(a)(3)(A) of the CAA, 42 U.S.C. § 7522(a)(3)(A). 42 U.S.C. § 7524(a).

208. Midwest Truck and Mr. Davis are each liable to the United States for injunctive relief and civil penalties of up to $4,819 for each violation of Section 203(a)(3)(A) occurring after November 2, 2015, and assessed on or after January 13, 2020, in accordance with Sections 204(a) and 205(a) of the CAA, 42 U.S.C. §§ 7523(a) and 7524(a). 40 C.F.R. § 19.4 (2020).

## IX. FIFTH CLAIM FOR RELIEF

### *Against RCD and Mr. Davis for Illegal Transfers in Violation of the Federal Debt Collection Act 8 U.S.C. § 3304*

209. The United States re-alleges Paragraphs 1–168 above as fully set forth herein.

210. Following an inspection conducted at one of Defendant's facilities on January 11, 2018, and after issuance to RCD of an Information Request pursuant to CAA Section 208, 42 U.S.C. § 7542, on February 15, 2018, and a second Information Request, issued on October 29, 2018, RCD commenced the transfer of substantially all of its assets to Mr. Davis on or about November 30, 2018.

211. RCD's transfer of its assets rendered RCD insolvent and RCD received no consideration or compensation for the transfer.

212. RCD made the transfers to avoid paying the United States a debt and in a manner that exhibits the badges of fraud set forth in Section 3304(b)(2) of the FDCPA, 28 U.S.C. § 3304(b)(2). The transfers had the effect of hindering collection efforts and were fraudulent as to a debt of the United States under Section 3304(b)(1)(A) of the FDCPA, 28 U.S.C. 3304(b)(1)(A).

31

213. Mr. Davis is a transferee against whom the United States may recover judgment under the FDCPA, 28 U.S.C. § 3307(b).

## RELIEF REQUESTED

WHEREFORE, the United States respectfully requests that this Court:

A.    Assess civil penalties against Mr. Davis for his numerous violations of Sections 203(a)(3)(A) and (B) of the CAA, 42 U.S.C. §§ 7522(a)(3)(A) and (B), in the amount of up to $4,819 for each violation occurring after November 2, 2015;

B.    Assess civil penalties against RCD for its numerous violations of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), in the amount of up to $4,819 for each violation occurring after November 2, 2015;

C.    Assess civil penalties against RCDP for its numerous violations of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), in the amount of up to $4,819 for each violation occurring after November 2, 2015;

D.    Assess civil penalties against Midwest Truck for its numerous violations of Sections 203(a)(3)(A) and (B) of the CAA, 42 U.S.C. §§ 7522(a)(3)(A) and (B), in the amount of up to $4,819 for each violation occurring after November 2, 2015;

E.    Permanently enjoin each Defendant from manufacturing, selling, offering to sell, or installing motor vehicle parts or components intended for use with a motor vehicle or motor vehicle engine where a principal effect of such part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with Title II of the CAA;

F.    Permanently enjoin each Defendant from removing or rendering inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in

32

compliance with Title II of the CAA;

G.      Order the Defendants to take other appropriate actions to remedy, mitigate, and offset the harm caused by their alleged CAA violations;

H.      Enter judgment pursuant to 28 U.S.C. §§ 3306(a) and 3307(b) in favor of the United States against RCD and Mr. Davis ordering each of them to pay the United States up to the amount of the fraudulent transfers, to the extent necessary to satisfy RCD's debt under the CAA;

I.      Award the United States its costs and disbursements in this action; and

J.      Award such other and further relief as the Court may deem just and proper.

Respectfully submitted,


TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

/s/ *Lila C. Jones*
LILA JONES
Trial Attorney (NM Bar # 148098)
Environmental Enforcement Section
FREDERICK S. PHILLIPS
Senior Attorney (D.C. Bar # 433729)
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington D.C. 20044-7611
(202) 305-2945
lila.jones@usdoj.gov
(202) 305-0439
frederick.phillips@usdoj.gov

Douglas J. Quivey
Acting United States Attorney
Central District of Illinois

Joshua Grant
Assistant United States Attorney
Office of the United States Attorney
Central District of Illinois
317 South Sixth Street
Springfield, IL 62701-1806
(217) 492-4450
JGrant2@usa.doj.gov

ANDRE DAUGAVETIS
Associate Regional Counsel
U.S. EPA, Region 5
77 W. Jackson Blvd. (C-14J)
Chicago, Illinois 60604
(312) 886-6663
daugavietis.andre@epa.gov